IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case Number:

REYNALDO WITTER, an individual,

          Plaintiff,

v.

CITY OF PLANTATION, FLORIDA, W. HOWARD HARRISON,
in his individual capacity, and MIGUEL LOPEZ in his individual
capacity as an officer with the City of Plantation Police Department,

          Defendants.

_____/

## COMPLAINT

Plaintiff, REYNALDO WITTER sues Defendants, CITY OF PLANTATION, W. HOWARD HARRISON, and MIGUEL LOPEZ, jointly and severally, and says:

### Jurisdiction

1.    This action is brought pursuant to 42 U.S.C. §§1983, 1988, the Fourth and Fourteenth Amendments to the United States Constitution, and the tort laws of Florida. Jurisdiction is founded on 28 U.S.C. §§1331, 1343, 42 U.S.C. §1988, the constitutional provisions mentioned above, and under the tort law of Florida. Supplemental jurisdiction, and joinder of parties for additional state law claims is proper pursuant to 28 U.S.C. §1367(a) because they form part of the *same case or controversy*. Plaintiffs assert multiple state tort law claims.

2.    Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) as all defendants work and/or reside in this district and all of the acts and omissions giving rise to this action occurred in the City of Plantation, Florida.

3.     In connection with the acts, practices and violations alleged below, the Defendants CITY OF PLANTATION (hereinafter "CITY"), W. HOWARD HARRISON (hereinafter "HARRISON"), and MIGUEL LOPEZ (hereinafter "LOPEZ") have each, either directly or indirectly violated clearly established constitutional rights, as well as statutory and common law duties owed to Plaintiff.

4.     All conditions precedent under Florida law for the filing of state law claims have been satisfied.

**Parties**

5.     The Plaintiff REYNALDO WITTER ("WITTER") at all times material hereto, has been a resident of Broward County, Florida, over the age of eighteen years and otherwise able to sue in his own capacity.

6.     Defendant CITY OF PLANTATION, FLORIDA, is a municipality duly organized under the laws of the State of Florida. PLANTATION is the governmental entity responsible, as a matter of law, for the actions of the **City of Plantation Police Department (hereinafter "Plantation PD" or "PPD")**, its officials, agents and employees, insofar as the **Plantation PD** is an administrative subdivision of the City of Plantation.

7.     Defendant W. HOWARD HARRISON is the Chief of Police for the City of Plantation, a Florida municipality.  HARRISON was appointed Chief by the Plantation City Council, and has served in that capacity since October 2009.  HARRISON is responsible for the officers in his employ, and ensuring that the officers, employees, servants and agents of the Plantation Police Department obey the laws of the State of Florida and the United States., Defendant HARRISON is the final policymaker or the Plantation City Council's delegee responsible for all operational and investigative policies, training and supervision, practices, customs, and orders of the Plantation Police Department.

8.      Defendant MIGUEL LOPEZ ("LOPEZ") is a duly appointed law enforcement officer of the Plantation Police Department, at all times material hereto acting under color of law, to wit: under the color of statutes, ordinances, regulations, policies, practices, customs and usages of the CITY OF PLANTATION, HARRISON, and/or the State of Florida. Defendant LOPEZ is being sued in his individual capacity.

**General Allegations of Fact**

9.      Defendants HARRISON and LOPEZ violated Plaintiffs' constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution as well as the laws of Florida. It is further alleged that these violations were committed as a result of malice, recklessness, deliberate indifference, and/or plain incompetence LOPEZ, and/or HARRISON; and/or pursuant to the policies, practices and/or customs of Defendant CITY.

10.      On February 24, 2013 WITTER pulled his car onto a grass swale area adjacent to Central Park Place, a six-lane east-west vehicular thoroughfare in Plantation, Florida, at or about N. W. 101st Avenue.  Mr. WITTER parked his car under a city lamp post, and the immediate area was well lit.

11.      This stretch of Central Park Place runs along the south boundary of a gated residential community known as Sunset Cove. The homes are separated from the roadway by a mature dense partitioning hedge of ficus planted along a four (4) foot concrete security wall.

12.       The particular spot where WITTER parked his car is directly behind the home of his then girlfriend Ms. Carolyn Branfield. Ms. Branfield's home also happens to be directly next door to the Defendant LOPEZ.

13.       Sunset Cove is secured by an electronically controlled gate. The gate is accessed by using an intercom or telephone to call the resident who then opens the gate. Ms. Branfield's home is the fourth house in from the entrance gate. LOPEZ'S house is the third.

14.     At approximately 12:30 a.m., just prior to pulling onto the swale, WITTER had driven his car to the entrance gate and called Ms. Branfield to notify her that he had arrived. Ms. Branfield was expecting WITTER but had fallen asleep while waiting and did not hear the telephone.

15.     Instead of waiting at the gate while he continued to call WITTER drove the short distance to the swale area on Central Park Place behind her house and pulled over.

16.     While waiting before calling back, WITTER exited his car to retrieve a clean shirt from his back seat. He is employed as an auto mechanic who owns his own small shop and often works late into the evening.

17.     While searching in the back seat of the car WITTER left the front door open such that both left side doors were fully open and the dome light inside the car was illuminated. For added light in the back seat area WITTER was also using a small LED penlight.

18.     At about this time LOPEZ arrived at his home either mid-shift or at the end of his work shift. He was driving a police vehicle and arrayed in his police uniform and carrying both his issued firearm and Taser.

19.     Upon seeing WITTER parked on the opposite side of the hedge and wall LOPEZ became irrationally and disproportionately disturbed at the prospect of another person near his home.

20.     WITTER alleges here, based on the circumstances specifically stated above, that no person of reasonable intelligence, sensibility or perception, would perceive that WITTER was attempting to enter onto LOPEZ'S property or engage in a criminal act.  In fact, it could only have appeared to a reasonable person that WITTER was simply a stranded motorist, or someone searching for something in his back seat while pulled over along a main, well lighted roadway. Moreover, the sheer density of the hedge, and height of the concrete would also immediately

dispel any suspicion that WITTER was attempting to unlawfully enter onto LOPEZ'S property unless WITTER was doing something overtly resembling an attempt to do so, which he has not. He was simply standing on the far side of his car looking in the back seat.

21.     LOPEZ then reentered his car and drove outside the gate of the Sunset Cove association to where WITTER was parked. LOPEZ approached WITTER in a rage attempting to place WITTER under arrest.

22.     When WITTER voiced his objection, stating "I've done nothing wrong," LOPEZ drew his Taser and deployed two rounds of conductive electricity against WITTER. At no time did WITTER resist LOPEZ or offer any violent response to LOPEZ'S actions.

23.     As he was being Tasered, WITTER screamed out in pain and told LOPEZ that he was visiting his girlfriend. Ignoring the obvious pain he was inflicting and t WITTER'S explanation, LOPEZ refused to stop, continuing to deploy the Taser.

24.     Hearing the screaming Ms. Branfield was awakened and came outside into her back yard. Later, she came around the street corner to enquire regarding WITTER'S well-being. When she did so WITTER was threatened with arrest by LOPEZ and/or other Plantation PD officers.

25.     Despite being made aware that WITTER'S presence in the area was innocent, and that his assumptions were unfounded, LOPEZ then placed WITTER under arrest for Resisting an Officer Without Violence. LOPEZ also issued WITTER a written trespass warning intended to prevent him from entering the area.

26.     On February 6, 2014 the criminal prosecution initiated by LOPEZ was terminated by the prosecuting authority of Broward County via *nolle prosequi*.

27.     To the extent that LOPEZ was able to, and/or did, understand that his arrest and use of force against WITTER violated clearly established civil rights held by WITTER,

LOPEZ'S actions were guided by the knowledge that he could do so with impunity, and without fear of discipline, oversight, meaningful review and/or scrutiny by HARRISON.

28.     Indeed, Defendant LOPEZ'S actions were personally reviewed, ratified and approved by Defendant HARRISON on March 18, 2013.

**Defendant, CITY OF PLANTATION'S Written Policies and Procedures**

29.     In 2009, the City of Plantation Police Department adopted a Standard Operating Procedure concerning the Taser X-26, which was modified in 2009 and 2011.   The policy provided that a Taser can be used to control a "dangerous or violent subject" when deadly physical force does not appear to be justified or necessary; or when attempts to subdue the subject by other conventional tactics have not been effective or are unlikely to be effective; or where there is a reasonable expectation that it will be unsafe for officers to approach within the contact range of the subject.

30.     In 2003, the City of Plantation Police Department adopted General Order 16 (G.O. 16), concerning "Control Measures and Use of Force," and this Order was revised in 2011. This Order's provisions include, but are not limited to the following: (a) the use of excessive force shall be subject to administrative sanction (G.O. 16(1)); (b) the use of force shall be progressive, escalating as a situation escalates (G.O. 16(2)(B)); (c) the force used shall de-escalate when the force with which the officer is opposed de-escalates(G.O. 16(2)(C); (d) the officers should only use the force reasonable and necessary to neutralize an unlawful assault against the officer, protect another person, overcome resistance by a person being arrested, or prevent an escape (G.O. 16(4)(B)); (e) where there is only verbal resistance, an officer is initially required to use dialogue and verbal direction and/or a soft assisting touch or firm strong touch (G.O. 16(5)(B)); and (f) non-lethal weapons can be employed "to defend themselves against unlawful assaults" where higher levels of force are not reasonable or necessary and other verbal

and physical force alternatives would be, or have been, ineffective and inappropriate (G.O. 16(6)).

31.    General Order 16 also provides that when ordered by the Chief of Police, the Internal Affairs investigator shall conduct an administrative investigation regarding any use of force.   Also, annually in February, per General Order 16, the Internal Affairs investigator is required to conduct an analysis of all use of force incidents in the previous year.   The report will determine if there are patterns or trends that indicate training needs or directive modifications.

**Liability of Defendants, CITY OF PLANTATION and HARRISON**

32.    The City of Plantation Police Department is an administrative subdivision of the City of Plantation, Florida.    Defendant, CITY OF PLANTATION, acting through its City Council, is the ultimate policy-making authority for all officially adopted policies and procedures implemented by the CITY'S employees.    Further, it is the entity legally responsible for the supervision and training of employees of the Plantation PD.

33.    On information and belief, the Plantation City Council delegated to HARRISON, in his capacity as Chief of Police, the authority to develop, direct and implement policies for all sworn law enforcement officers, including guidelines for the use of force, including the use of Tasers, arrest procedures and other guidelines controlling the interaction between PPD law enforcement officers and the general public.

34.    At all times material hereto CITY was on notice of a pattern and practice of widespread use of excessive force, and/or illegal arrest by Plantation PD officers, and LOPEZ in particular, similar in nature and identity to the events which occurred on February 24, 2013 against WITTER.

35.     Defendant CITY has been, and continues to be, deliberately indifferent to the promulgation of policies and/or customs insufficient to protect the constitutional rights of the citizenry it  is obligated to serve.

36.     The Defendant HARRISON'S systematic and consistent approval and ratification of excessive use of force, and factually unsupported arrests, in relation to the tasks necessarily performed by Plantation PD officers constitutes a "city custom," which was the cause and/or moving force of the injuries to the Plaintiff WITTER. The causal connection is established by a history of widespread abuse of which HARRISON knew, or should have known, since at least the year 2010.  Abuse of citizens' rights was obvious, flagrant, rampant and of continued duration.

37.     In fact, HARRISON'S personal review of uses of force and/or false arrest was meaningless, perfunctory and/or mere formality, in certain instances approving and ratifying uses of force that expressly contradict his own written policies and orders.

38.     Despite having such notice HARRISON failed to take remedial action by way of supervision, training, and/or discipline of any of the CITY'S officers who used excessive force, or who made illegal arrests. No investigation into any instance of use of force, or questionable arrest, by a City of Plantation police officer from 2010 until the date of February 24, 2013 resulted in any meaningful or necessary remedial action, retraining and/or discipline, including instances of excessive use of force and factually unsupported arrests.

39.     As such, City officers, including Defendant LOPEZ, are comfortable in the assurance that their use of excessive force or illegal arrests will not result in any discipline or negative consequences affecting their employment.

40.     The CITY'S deliberate indifference, and allowance of deficient CITY policy and/or custom, created a foreseeable assurance and likelihood that the rights of citizens would become the victims of constitutional violations by Plantation PD officers.

41.     The injuries suffered by WITTER was the result this deliberate indifference in that the failure of  HARRISON to take meaningful and appropriate action by retraining, discipline, supervision, and/or any other remedial action, in instances where City officers made illegal arrests and/or used excessive force, allowed Defendant LOPEZ to believe he could violate the Plaintiff's rights, as set forth herein, with impunity. As such, the deliberate indifference to the rights of citizens by the CITY was the moving force that resulted in the injury to the WITTER.

**Instances of Excessive Use of Force and Illegal Arrest Evidencing City Custom**

42.     Defendant CITY  knew, or should have known, that the Defendant LOPEZ, as well as other Plantation PD officers, were engaged in a pattern of illegal detention and excessive use of force and related violations of citizens' rights, but instead ignored these abuses, and did systematically ratify any arrest and/or use of force without proper review, scrutiny and/or supervision. Such instances include, but are not limited to, the following:

***Barbara Henry***

43.     On February 8, 2010 Defendant MIGUEL LOPEZ intentionally shot and struck Ms. Barbara Henry through the driver's side window of the car she was operating with his service firearm. LOPEZ was assisting the City of Sunrise Police Department conducting an area perimeter search as a result of a robbery that occurred at a nearby Walgreens. The suspects were last seen running on foot north from the business. LOPEZ positioned his police vehicle north of the Walgreens in a north/south roadway, at roughly a 90-degree angle to the flow of traffic, thereby blocking the north lane and partially blocking the south lane. LOPEZ'S sworn account

was that he observed Ms. Henry's vehicle, *"...and fearing that, you know, she's not—the person in the vehicle, whoever was in the vehicle, and knowing the suspects coulda, when they broke north, jumped into a vehicle and are trying to get **outta** the—the perimeter point, I took my gun outta the holster..."*

44.     LOPEZ'S claimed justification that he believed he was in danger from felony suspects fleeing north to break outside of the perimeter was false. A cursory review of the positioning of the vehicles, through photographs, diagrams, and at least three other police reports, as well as the statement of Ms. Henry who lives just *outside* the perimeter and had just left her home to go to work, easily shows that she was travelling *south **into** the perimeter*.

45.     The officer in charge of conducting the perimeter search was Sgt. Jimmy Patrizi of the Sunrise Police Department. Sgt. Patrizi confirms that there was no order or directive at the time to keep vehicles from entering the perimeter.

46.     Secondly, LOPEZ claimed that he shot Ms. Henry to protect himself as Ms. Henry's vehicle was driving at an unsafe speed, swerved around his car leaving the roadway, and then *"...was coming straight toward me..."* LOPEZ also suggests that he was struck by Ms. Henry's vehicle and that he shot into her window because he was in fear that he would be dragged by the vehicle, and that he needed *"to stop the car right there."*

47.     Defendant LOPEZ'S account is at best confusing, and in significant fashion contradicted by the physical evidence, common sense, and the account of Ms. Henry wherein she states under oath that she was merely proceeding at 15-20 miles an hour, *slowly* in a safe manner to maneuver around the police vehicle on her way to work.

48.     LOPEZ, according to his own testimony and that of Ms. Henry, was standing to the front of his car protected by the engine block. A reasonable review of the interview of Ms. Henry by Det. Christopher Piper of the Sunrise Police Department clearly shows that the

interviewer was intent upon creating ambiguity as to whether Ms. Henry's vehicle might have struck LOPEZ despite her insistence that she was driving safely and easily around the police vehicle.

*Q. [A]t some point your vehicle is past his vehicle?*

*A. Right.*

*Q. Did you see where he was at that point?*

*A. No. Cause I passed him then.*

*Q. Okay. So you are assuming that he was still standing at the car?*

*A. Yes.*

*Q. Okay. But you're not—you can't be sure because you didn't see him?*

*A. Right Right.*

*Q. Did you ever hear him tell you to stop? A. No.*

*Q. Okay. And just again to reiterate, you don't know exactly where he was at when the gun – when you hear the gun shot?*

*A. No. He's supposed – he supposed to be by his car standing up, if you – yeah.*

*Q. I know you say he was 'supposed to be' cause that's where you saw him when you went to maneuver around his car.*

*A. Uh-huh.*

*Q. Is there – a chance that your car or you – the side-view mirror of your car could have struck him?*

*A. I doubt it. I doubt it.*

*PIPER: you either did or you didn't. You – it's a yes or a no. Its very simple.*

*A. No I didn't. I didn't hit him. I didn't hit him.*

*Q. You didn't feel the car hit him? A. No.*

11

49.     The interview of Ms. Henry is best characterized by the interviewer's remarks, "I'm not trying to argue with you," and "I'm not trying to put words in your mouth." The interview of LOPEZ is best characterized as lacking any scrutiny of LOPEZ'S account, and complementary to establishing that LOPEZ acted appropriately and was justified in shooting of Ms. Henry.

50.     Despite the obvious and easily discernible fact that LOPEZ shot Ms. Henry unnecessarily and most likely because she simply ignored his unauthorized order not to proceed into the perimeter, as well as patent inconsistencies suggesting as much, and the defective nature of the investigation, including LOPEZ'S account, Defendant HARRISON personally reviewed, ratified and approved LOPEZ's use of force in shooting Ms. Henry after review on June 29, 2010. The only corrective, remedial or supervisory action taken, albeit meaningless, was that LOPEZ was to be advised that the initial positioning of his vehicle might have been different.

**James Williams**

51.     On November 6, 2011 Plantation PD Officers Joseph K. Miller and Mitchell Fraska repeatedly deployed their Tasers on Mr. James Williams multiple times, knowing that Mr. Williams did not present a threat to himself or them. Officer Miller responded to a vehicle accident and noticed Mr. Williams in a nearby bush.  Officer Miller ordered him to come out. Officer Miller had no suspicion of a crime. When Mr. Williams did come out he took flight. At no time did either officer see a weapon, nor did Mr. Williams offer any physical resistance. After he again crawled into a bush and refused to exit, he was Tasered for his refusal to comply. The officer's use of the CED for multiple cycles was clearly excessive. The use of force investigation personally reviewed and approved by HARRISON on December 5, 2011 recommended no additional scrutiny or training.

*Richard Gallego*

52.    On August 8, 2012, Plantation PD Officer Joseph K. Miller, while out of jurisdiction, encountered Mr. Richard Gallego, who had briefly exited his vehicle at a red stoplight. Officer Miller then began to follow Mr. Gallego for no justifiable reason. When the vehicle stopped again Officer Miller exited his vehicle and approached the driver's window rapping with his flashlight. Officer Miller then claimed that he repositioned himself in front of the car, and that he was struck by a side-view mirror when Mr. Gallego fled. In truth, Mr. Gallego simply drove to his home, parked and exited his vehicle. Officer Miller pulled in behind him, exited his car and deployed his Taser on Mr. Gallego. Mr. Gallego was arrested for numerous offenses including aggravated battery on a police officer, all of which were either not accepted by the prosecuting authority of Broward County, or later dismissed.

53.    A reasonable review of the reports and the use of force investigation, that was not deliberately indifferent to the right of citizens, would have called into question the officer's actions and use of force. However, on September 5, 2012 Defendant HARRISON personally reviewed, approved and ratified the use of force.

*Karl Samuel Jean-Francois*

54.    On February 1, 2013, Plantation PD Bike Patrol Officer Craig Boermeester deployed his TASER weapon on Mr. Karl Samuel Jean-Francois simply because he disobeyed Officer Boermeester's unlawful command to stop. At the time, Mr. Jean-Francois was sitting on a bench smoking a cigarette. Without legal justification (articulable suspicion or probable cause) Boermeester attempted to detain Mr. Jean-Francois. When he began to walk away Boermeester deployed his Taser. Mr. Jean-Francois had no duty to obey the officer's command, had not committed any crime, and presented no threat of danger to himself or anyone else. The use of

force was clearly excessive. However, it was personally reviewed, ratified and approved by Defendant HARRISON on March 18, 2013.

55.    The above list is <u>not</u> exhaustive, but is sufficient to show a common design to support the inference that the instances would not occur but for approval or ratification of the custom by Defendant HARRISON as the municipal official responsible.

56.    A review of over 450 use of force reports and complaints of unlawful arrest between the years of 2010 and 2015 indicates that in no instance did Defendant HARRISON determine that the actions of any Plantation PD officer was unjustified or that the arrest was legally unfounded.

57.    In each instance HARRISON personally reviewed and approved the actions of the officers. This willful disregard of any instance of excessive use of force and/or illegal arrest, by expressed written approval, did create a tacit custom permissive of unlawful behavior by City police officers.

<u>Count I</u>
<u>False Arrest and/or Imprisonment – 42 U.S.C. §1983 Claim</u>
<u>(Defendant LOPEZ)</u>

58**.**    Plaintiff hereby incorporates paragraphs 1- 57 above as if specifically set forth herein.

59.    On or about February 24, 2013, Defendant LOPEZ did unlawfully detain and/or seize REYNALDO WITTER by unlawfully restraining his movement and freedom while acting under the color of law.

60.    The subjective motivations of LOPEZ for accosting WITTER and immediately attempting to place him in custody are known only to him. However, at the time WITTER was no engaged in any activity that any reasonable person would believe to be criminal in nature and

supportive of probable cause or arguable probable cause. WITTER simply had the misfortune of pulling to the side of the road and retrieving something from his back seat in an area adjacent to LOPEZ'S home past midnight.

61.     As a direct and proximate cause of the illegal detention, and WITTER'S attempt to avoid same, he suffered financial loss in the form of attorney's fees, bail and other costs, loss of freedom by incarceration, physical injury by electrical shock, embarrassment and indignity, humiliation and/or emotional injury leading to interference with his enjoyment of life, including the breakup of his relationship to Ms. Branfield, stress, anxiety and loss of sleep.

**WHEREFORE**, the Plaintiff REYNALDO WITTER requests this Court enter judgment against Defendant LOPEZ individually, and award the Plaintiff compensatory and punitive damages, attorney's fees and costs, as well as all other further relief this Court deems just and proper.

**Count II**
**False Arrest and/or Imprisonment - State Tort Claim**
**(Defendant LOPEZ)**

62.     Plaintiffs hereby incorporate paragraphs 1- 57 above as if specifically set forth herein.

63.     On or about February 24, 2013, Defendant LOPEZ did unlawfully detain and/or seize REYNALDO WITTER by unlawfully restraining his movement and freedom while acting under the color of law.

64.      The unlawful arrest of WITTER was the result of the plain incompetence of LOPEZ while acting within the course and scope of his employment, and pursuant to the discretionary authority vested in him by the CITY.

65.     As specifically set forth above the illegal arrest and false imprisonment stem from actions by LOPEZ which were malicious, taken in bad faith, and/or with willful disregard for WITTER'S rights and well being.

66.     As a direct and proximate cause of the illegal detention, and WITTER'S attempt to avoid same, he suffered financial loss in the form of attorney's fees, bail and other costs, loss of freedom by incarceration, physical injury by electrical shock, embarrassment and indignity, humiliation and/or emotional injury leading to interference with his enjoyment of life, including the breakup of his relationship to Ms. Branfield, stress, anxiety and loss of sleep.

**WHEREFORE**, the Plaintiff REYNALDO WITTER requests this Court enter judgment against Defendant LOPEZ individually, and award the Plaintiff compensatory and punitive damages, attorney's fees and costs, as well as all other further relief this Court deems just and proper.

### Count III
### Malicious Prosecution – State Tort
### (Defendant LOPEZ)

67.     Plaintiff hereby incorporates paragraphs 1 - 57 as if specifically pled herein.

68.     As a direct and proximate result of the illegal arrest of the Plaintiff WITTER, a criminal case was commenced against him in Broward County (Case No.  13-3833 MM10A) on or about February 25, 2013.

69.     That case was terminated in favor of WITTER on or about February 6, 2014.

70.     The actions of Defendant LOPEZ were without any legal justification such that they constituted malice because they stemmed from his own personal anger, rage, fears and/or vindictive purposes, and not the lawful execution of his discretionary duties as a police officer.

71.     As a direct and proximate result of LOPEZ'S malice and the commencement of prosecution WITTER suffered financial loss in the form of attorney's fees, bail and other costs,

loss of freedom by incarceration, physical injury by electrical shock, embarrassment and indignity, humiliation and/or emotional injury leading to interference with his enjoyment of life, including the breakup of his relationship to Ms. Branfield, stress, anxiety and loss of sleep.

**WHEREFORE**, the Plaintiff REYNALDO WITTER requests this Court enter judgment against Defendant LOPEZ individually, and award the Plaintiff compensatory and punitive damages, attorney's fees and costs, as well as all other further relief this Court deems just and proper.

### Count IV
### Excessive Use of Force – 42 U.S.C. §1983 Claim
### (Defendant LOPEZ)

72.     Plaintiffs hereby incorporate paragraphs 1-57 above, as if specifically set forth herein.

73.     At no time during the events giving rise to this action did REYNALDO WITTER commit any act, motion or gesture to oppose any member of the Plantation Police Department, including LOPEZ, that might reasonably have been interpreted or perceived as a threat to their safety, health or well-being.

74.     Moreover, no probable cause or arguable probable cause existed for any arrest therefore any use of force was unjustified and excessive in violation of the Fourth Amendment.

75.     In an effort to conceal the illegal and violative nature of his actions, Defendant LOPEZ did falsify official reports, and/or did fail to report or concealed the facts and circumstances of his use of force.

76.     As a direct and proximate result of the force used against WITTER, he suffered physical injury by electrical shock, embarrassment and indignity, humiliation and/or emotional injury leading to interference with his enjoyment of life, including the breakup of his relationship

to Ms. Branfield, stress, anxiety and loss of sleep.

**WHEREFORE**, the Plaintiff REYNALDO WITTER requests this Court enter judgment against Defendant LOPEZ individually, and award the Plaintiff compensatory and punitive damages, attorney's fees and costs, as well as all other further relief this Court deems just and proper. .

## Count V
### Violation of 42 U.S.C. § 1983
### (Defendant CITY OF PLANTATION)

77.     Plaintiff REYNALDO WITTER incorporates paragraphs 1-57 above, as if specifically set forth herein.

78.     At all times hereto, the Plantation City Council was the final policymaker of the CITY for the drafting, adoption and implementation of ordinances and other policies formally regulating the actions of their employees with members of the general public, and delegated these responsibilities to Defendant HARRISON as Chief of Police; in the alternative, Defendant HARRISON was the final policymaker. In the years prior to February, 2013, there were several practices and customs that were so widespread, in terms of duration and frequency, that the knowledge of and acquiescence in these practices is chargeable to the City Council.

79.     One improper practice was the failure of the PPD to fully investigate discrepancies and misstatements in arrest reports and other official documents prepared by PPD officers, thus thwarting appropriate discipline and potential criminal sanctions against PPD officers.

80.     Another improper practice was the repeated act by the PPD  to routinely find what were in fact uses of excessive force to be justified or within guidelines. while at times acknowledging minor errors that led to minor, or no, discipline.  This led directly to an atmosphere within the PPD where officers believed that even the   most outrageous acts of

excessive force would be tolerated by the Department and the CITY.

81.     The practice of imposing no, or wholly inadequate, discipline on PPD officers was widespread, and the failure of the Chief of Police or City Council to impose appropriate discipline further led directly to an atmosphere within the PPD where officers believed that even the most outrageous acts of excessive force and other criminal acts by officers would be tolerated by the Department and the CITY, including such a belief by Defendant LOPEZ, who repeatedly Tasered Plaintiff without any justification.

82.     This deliberate indifference to police misconduct evinces the existence of a custom in the CITY to tolerate excessive force and wrongful arrests. The presence of this custom demonstrates that the City of Plantation has effectively ratified the type of police misconduct at issue in this case.

83.     Furthermore, since 2010, the CITY has compiled a litany of instances involving the inadequate investigation into allegations of substantial police misconduct, detailed herein above.

84.     In each of the instances referenced above, the response by the CITY was a failure to fully investigate the matter in a timely fashion or to reprimand the subject PPD officer with a punishment that befit each particular violation of constitutional rights. The failure by the defendant CITY to diligently investigate and discipline its officers for official misconduct has created an atmosphere where the PPD's employees believe that such misconduct constitutes behavior that will be tolerated and will not be sanctioned.

85.     These practices or customs of failing to properly investigate or discipline acts constituting unlawful arrest, excessive force or force sufficient to shock the conscience, and/or repetitive ratification of police misconduct, were the moving force behind and proximate cause of the deprivation of Plaintiff WITTER's Fourth and Fourteenth Amendment rights.

86.     As a direct and proximate result of the deprivation of Plaintiff WITTER's Fourth and Fourteenth Amendment rights through unlawful arrest and use of excessive force, WITTER suffered financial loss in the form of attorney's fees, bail and other costs, loss of freedom by incarceration, physical injury by electrical shock, embarrassment and indignity, humiliation and/or emotional injury leading to interference with his enjoyment of life, including the breakup of his relationship to Ms. Branfield, stress, anxiety and loss of sleep.

**WHEREFORE**, the Plaintiff REYNALDO WITTER requests this Court enter judgment against Defendant CITY OF PLANTATION, and award the Plaintiff compensatory damages, attorney's fees and costs, as well as all other further relief this Court deems just and proper.

### Count VI
### Violation of 42 U.S.C. §1983
### (Defendant W. HOWARD HARRISON)

87.     Plaintiff REYNALDO WITTER incorporates paragraphs 1 – 57 above, as if specifically set forth herein.

88.     At all times material hereto, Defendant HARRISON was the official decision-maker charged with the  responsibilities to adopt and implement policies, rules and regulations for the Plantation PD to reasonably ensure the protection of the constitutional rights of the public.

89.     These policies, rules and regulations necessarily included the implementation of policies and practices to detect, investigate, evaluate, and/or remediate and/or discipline the use of excessive force against, and/or false imprisonment of citizens, including Plaintiff REYNALDO WITTER, by Plantation PD officers.

90.     It is apparent from a review of the Use of Force Reports, and other documents, presented herein, which set forth a pattern of false imprisonment and/or excessive use of force

by Defendant LOPEZ and other police officers of the City of Plantation, that HARRISON was deliberately indifferent to these responsibilities, and to the rights of the public by expressly and/or impliedly failing to adopt or implement such policies or practices.

91.     To the contrary, that same pattern of constitutional violations, and HARRISON'S personal approval in every instance, evidences a custom which condones and encourages the widespread use of excessive force by its police officers, and/or illegal detention of citizens. Specifically, HARRISON maintained a custom that systematically ratified all uses of force and arrest without scrutiny or meaningful oversight, or adherence to his own written polices and/or orders.

92.     In short, the written policies and orders of Defendant HARRISON intended to protect citizens from excessive use of force, and illegal arrest were systematically ignored by HARRISON, and supplanted with a custom of deliberate indifference which resulted in such abuses.

93.     Despite easily discernible and discoverable abuses of the written policies, and/or orders regarding the use of force, Defendant HARRISON, and/or his subordinate command staff, did approve and/or ratify any use of force, or imprisonment without meaningful investigation or due diligence.

94.     HARRISON'S personal review and then ratification and approval, as indicated in each instance, led to a widespread pattern of abuse of which he had personal knowledge but did deliberately fail to stop.

95.     Scrutiny and review of Plantation Police Department Use of Force Reports, which include instances of stop and frisk and formal arrest from the years 2010 until the present, reveals that HARRISON has approved and/or ratified the use of force and imprisonment in every instance without exception. However, in multiple situations the level of force used, and/or the

legality of the imprisonment to any extent, was not justified and was in violation of HARRISON'S own written policies, procedures and/or orders. On multiple occasions during this time period the official reports and documents necessary for review reflect violation of the written policies on their face, and/or that HARRISON possessed information provided by the prosecution authority of Broward County that the actions of the Plantation PD officers in question were illegal.

96.     HARRISON'S failure to implement his own written policies and orders,, and his approval of any use of force or arrest without meaningful review or scrutiny strongly infers a reckless disregard for the rights of the public he is charged to protect from abuse of constitutional rights by City of Plantation police officers.

97.     HARRISON'S failure to enforce or implement his own policies and orders to prevent such abuses, and instead ignore those policies, created an environment where the City of Plantation police officers were comfortable in the knowledge that they could violate the rights of citizens without any concern for review, scrutiny, discipline, consequence, and/or reproach for their actions.

98.     In this instance specifically, HARRISON'S indifference to the rights of citizens was a direct and proximate cause of the injuries suffered by WITTER because at the time he assaulted and arrested WITTER, LOPEZ knew and/or was reasonably comfortable in the knowledge that his actions would be approved and condoned by his supervisors, including HARRISON.

99.     The failure of Defendant HARRISON to implement his own written policies and/or orders intended to prevent violation of the rights of citizens, and instead his maintenance of a tacit custom of ratifying the use of excessive force and/or illegal arrest by Plantation PD officers was  the direct and proximate cause of the harm suffered by REYNALDO WITTER,

including financial loss in the form of attorney's fees, bail and other costs, loss of freedom by incarceration, physical injury by electrical shock, embarrassment and indignity, humiliation and/or emotional injury leading to interference with his enjoyment of life, including the breakup of his relationship to Ms. Branfield, stress, anxiety and loss of sleep.

**WHEREFORE**, the Plaintiff REYNALDO WITTER requests this Court enter judgment against Defendant HARRISON individually, and award the Plaintiff compensatory and punitive damages, attorney's fees and costs, as well as all other further relief this Court deems just and proper.

### Trial by Jury

100.    Plaintiff WITTER demands trial by jury for all issues so triable by right.

*Respectfully submitted* this  15th day of June, 2016.

s/ David A. Frankel
David A. Frankel, Esq.

**Law Offices of David A. Frankel, P.A.**
20 South East 20th Street
Fort Lauderdale. Florida 33315
(954) 557-2244
Fla. Bar Number 741779
david@BlueLotusLaw.com